{¶ 1} Appellants, Rebecca Cook and Mario Botello, appeal a decision of the Seneca County Common Pleas Court, Juvenile Division, awarding permanent custody of their minor child, Saliah Cook, to appellee, Seneca County Child Department of Job and Family Services ("SCFS"). On appeal, Cook and Botello argue that SCFS failed to present sufficient evidence as to the elements necessary for an award of permanent custody and that the decision was against the manifest weight of the evidence. Upon review of the record, we find that sufficient, competent, credible evidence was presented as to the need for permanent commitment of this child to the state and, therefore, affirm the judgment of the trial court.
 {¶ 2} Facts and procedural posture pertinent to issues raised on appeal are as follows: Saliah Ann Cook was born on March 3, 2000, to Rebecca Cook and Mario Botello. On March 6, 2000, Saliah was placed in the emergency custody of SCFS, based upon a complaint of dependency filed in Seneca County Juvenile Court. At the time of the complaint, another child of the couple, Zachary Cook, born November 21, 1998, was in the temporary custody of Franklin County Department of Job and Family Services ("FCFS") for a series of unexplained injuries requiring medical attention, including adult human bites to his cheek, suspicious burns, and a skull fracture. In addition, Cook had her parental rights to another sibling, Ariana Cook, born March 23, 1996, involuntarily terminated and permanent custody awarded to Hancock County Department of Job and Family Services in 1998.[1] Cook petitioned for and received a civil protection order against Botello in March 2000, as a result of repeated threats and intimidating conduct.
 {¶ 3} On May 4, 2000, Saliah was found to be a dependent child and temporary custody was continued with SCFS. Requirements for reunification, as delineated in the judgment entry and incorporated into the case plan, required each parent to: (1) attend counseling to address individual issues and comply with all counselor recommendations until satisfactorily discharged; (2) maintain stable employment and stable housing; (3) cooperate with SCFS; (4) attend appropriate parenting classes to address parenting skill deficiencies; and (5) provide medical and child support as previously ordered. In addition, Botello was prohibited from having any contact with Cook, as per the civil protection order, and was directed to initiate domestic violence counseling within the following ten days. The parents were ordered to submit written reports regarding counseling, visitation, drug testing, and domestic violence to the court on or before a July 14, 2000 review hearing.
 {¶ 4} Upon the evidence adduced at the July 14, 2000 hearing, the trial court found that the parents had made little progress toward reunification despite the reasonable efforts of SCFS. Rebecca was unemployed and had missed several counseling appointments. Botello had only recently obtained employment and had missed several counseling appointments due to unrelated legal problems and a recent violation of the existing civil protection order. Both parents owed child support arrearages and neither parent had maintained stable employment, a stable residence, or obtained health insurance for Saliah. The court reviewed the case plan, ordered the parents to return to counseling, and amended the plan to require Cook to attend domestic violence counseling. Botello was admonished for threatening behavior towards SCFS caseworkers, and his visitation rights were terminated until he provided a satisfactory counselor report showing he was amenable to visitation. The matter was scheduled for review in six months.
 {¶ 5} Cook's attorney was permitted to withdraw from the case in August 2000, due to her missing three appointments, mail being returned as "moved, left no address," her phone being disconnected, and lack of contact since July 14, 2000.
 {¶ 6} On November 1, 2000, SCFS moved for expedited review because both parents had expressed a desire to voluntarily surrender custody of Saliah. On November 17, 2000, SCFS moved for continued temporary custody and permanent custody, citing that the child had been in temporary custody since birth, that her parents had made minimal progress with the case plan, and that she could or should not be placed with either parent. The matter was scheduled for adjudication beginning January 20, 2001. Botello failed to appear for the hearing, claiming to be fearful that authorities would execute of a warrant for his arrest for failure to comply with orders of the Fostoria Municipal Court and that he would be unable to participate in the proceeding. The matter was rescheduled for February 8, 2001, and continued through February 13, 2001.
 {¶ 7} By February 2001, a Franklin County magistrate had terminated Cook and Botello's parental rights to Zachary Cook and awarded permanent custody to FCFS. The decision was adopted and objections thereto were overruled by the Franklin County Common Please Court, Juvenile Division, on August 23, 2001.
 {¶ 8} By entry dated February 16, 2001, the trial court again determined that, as of November 17, 2000, minimal progress had been made toward case plan requirements. Botello had not completed parenting, domestic violence or other counseling, and had failed to take any steps to support his child. Even though he had intermittent employment in preceding years and was capable of earning a wage, he continued to avoid his responsibility to pay support, provided no medical insurance for his child, and submitted no evidence that he had provided the child any food, clothing, shelter, or other care. Although Cook visited Saliah after the initial removal and had recently initiated some counseling programs, she had failed to complete parenting, domestic violence or other counseling, had intermittent employment, and had relocated several times. Neither parent had maintained stable employment or a stable, suitable residence, nor obtained a driver's license. Nevertheless, the court provided the parents continued opportunity to comply with the case plan requirements, maintaining temporary custody with SCFS and ordering the parents to complete case plan requirements before June 1, 2001. The matter was continued for review as of June 19, 2001.
 {¶ 9} Cook's attorney requested a continuance a day before the June 19, 2001 hearing due to a lack of communication with Cook. The motion was denied. Despite proper notification and service, neither parent appeared for the review hearing. It was subsequently revealed that Cook had moved to Indiana, where she remained from the first part of March 2001, until mid-July 2001, and had failed to keep the single visitation appointment she had scheduled in the past four months. Although Botello had submitted a motion for visitation, he failed to attend the hearing in support thereof. He further failed to attend appointments with SCFS, had attended only two of twenty-four domestic violence classes, and had not obtained a satisfactory visitation recommendation from a counseling agency. Despite this lack of effort or commitment, the court continued the matter for review.
 {¶ 10} On December 10, 2001, SCFS again moved for continued temporary custody and permanent custody, citing that the child had been in temporary custody in excess of twenty-one months and that the parents had made little or no progress on the case plan. Service on Botello required multiple postings because he withheld his current mailing address and phone number due to an outstanding warrant in the Seneca County Common Pleas Court. The hearing for permanent custody began April 8, 2002, but was suspended the following day due to the birth of Feliciah Cook, Saliah's sibling, for whom Botello was the putative father.
 {¶ 11} Cook had previously denied being pregnant to SCFS caseworkers and the couple, believing that SCFS had been notified of her pregnancy, attempted to conceal the birth by going to an unscheduled hospital out of the county. Feliciah was taken into protective custody the following day. By agreement of the parties, Feliciah was found to be a dependent child and, on June 26, 2002, SCFS was relieved from making reasonable reunification efforts due to previous involuntary terminations of their parental rights to Zachary Cook and Cook's rights to Ariana Cook.[2]
 {¶ 12} When the permanent custody hearing for Saliah reconvened, SCFS moved to join Feliciah to the ongoing custody action concerning Saliah. Although Saliah's case plan was amended to include Feliciah, the court elected to proceed separately with and independently review the permanent custody motions. The permanent custody hearings for Saliah continued on May 24 and 25, 2002, and were concluded June 13 and 19, 2002. Pursuant to entry dated June 21, 2002, the trial court awarded permanent custody of Saliah to SCFS. Cook and Botello perfected separate appeals from the determination, each presenting a single assignment of error for our review:
Cook's Assignment of Error:
 {¶ 13} "The Trial Court committed reversible error in granting permanent custody to the Seneca County Department of Job and Family Services which is against the manifest weight of the evidence presented."
Botello's Assignment of Error:
 {¶ 14} "The Trial Court erred and abused its discretion in granting the Motion for Permanent Custody filed by the Seneca County Department of Job and Family Services, because the evidence presented failed to meet the burden of proof placed on the Agency, of clear and convincing evidence, as to the required elements for a termination of parental rights under O.R.C. 2151.414; specifically, the agency failed to make diligent efforts to reunify the child with the parties."
 Reasonable Efforts of SCFS {¶ 15} Within their respective assignments of error, Cook and Botello complain of communication difficulties with caseworkers and assert that SCFS failed to make reasonable efforts toward or provide assistance with their attempts at reunification. Botello avers that SCFS failed to implement aspects of the case plan, thereby hindering or obstructing the parties' attempts at reunification. He argues that the lack of reference to these purported shortcomings illustrates that the court acted arbitrarily and unconscionably by failing to afford due consideration to matters that he claims were beyond their control.
 {¶ 16} As an initial matter, we note that appellate courts must adhere to "every reasonable presumption in favor of the lower court's judgment and finding of facts."[3] "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."[4] Judgments supported by competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.[5]
 {¶ 17} Although an agency in temporary custody of a child generally bears a duty to employ diligent efforts toward family reunification, agencies may be relieved of that duty under several circumstances, and a determination as to whether the agency made reasonable efforts is not necessary for an award of permanent custody pursuant to R.C. 2151.414.[6]
Where, as here, a parent from whom a child was removed has had parental rights involuntarily terminated with respect to a sibling of the child, R.C. 2151.419(A)(2) directs that "[t]he court shall make a determination [at any hearing held pursuant to sections 2151.28, 2151.31(E), 2151.314,2151.33, or 2151.353 of the Revised Code at which the court removes the child from the child's home or continues the removal of the child from the child's home] that the agency is not required to make reasonable efforts to * * * eliminate the continued removal of the child from the child's home [or] return the child to the child's home."[7] Moreover, R.C. 2151.413(C) specifically mandates that "[t]he court shall not deny an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the case plan."
 {¶ 18} Although the May 1998 termination of Cook's parental rights to Ariana Cook and August 2001 termination of both parents' rights to Zachary Cook relieved SCFS from making reasonable reunification efforts, the trial court continued to review and repeatedly approved SCFS's efforts throughout the proceedings. A majority of the purported shortcomings were related to phone calls Cook made in the summer or fall of 2001 that were not returned by SCFS. However, as discussed below, Cook was residing in Indiana at the time and had failed to attend several scheduled visitations. Furthermore, SCFS caseworkers identified significant periods wherein the parents would not contact the agency and testified that Botello refused to provide his address or phone number, that they returned nearly all phone calls, and that repeated follow-up calls were made when a parent requested visitation or other assistance. In its final entry, the trial court again determined that the agency had made reasonable efforts toward reunification as required by law and proceeded to outline the attempts of several caseworkers and counselors to assist Cook and Botello in satisfying case plan requirements. Upon review of the record, we find no indication that the trial court acted arbitrarily or unconscionably and hold that the record contains competent, credible evidence supporting the trial court's determinations.
 Sufficiency and Manifest Weight {¶ 19} A parent's right to raise his or her child is an "essential" and "basic civil right."[8] Parents have a "fundamental liberty interest" in the care, custody, and management of their children.[9] The rights and interests of a natural parent are not, however, absolute: where a court finds that permanent custody is appropriate under circumstances of a particular case and all due process safeguards have been followed, whatever residual rights a parent may have are properly divested.[10]
Decisions concerning child custody matters lie within the sound discretion of the trial court and will not be reversed unless the trial court abused its discretion.[11] An abuse of discretion occurs when a court renders a decision that is arbitrary, unreasonable or unconscionable.[12]
 {¶ 20} Because constitutionally protected liberty interests are at stake in a permanent custody proceeding, due process requires the movant to prove that applicable statutory factors have been proved by clear and convincing evidence.[13] Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to facts sought to be established.[14] Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact complied with statutory requirements and whether there was sufficient evidence to support its finding by clear and convincing evidence that one or more statutory factors precluding that child's return to either parent exist.[15]
 {¶ 21} R.C. 2151.413 permits an agency granted temporary custody of a child who is not abandoned or orphaned to move for permanent custody. R.C. 2151.414(B)(1) provides that permanent custody may be granted if the court determines, by clear and convincing evidence, that such action will serve the best interests of the child and that any of the following factors apply: (a) the child is not abandoned or orphaned or has not been in the temporary custody of one or more public services agencies or private child placing agency for twelve or more months of a consecutive twenty-two month period, but cannot be placed with either parent within a reasonable time or should not be placed with either parent; (b) the child is abandoned; (c) the child is orphaned without relatives able to take permanent custody; or (d) the child has been in the temporary custody of one or more public services agencies or private child placing agency for twelve or more months of a consecutive twenty-two month period.
 {¶ 22} The focus of the "best interest" determination is upon the child, not the parent,[16] as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. In determining the best interests of a child, R.C.2151.414(D) provides that "the court shall consider all relevant factors, including, but not limited to, the following: "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 23} R.C. 2151.414(E) provides that if, after considering all relevant evidence, the court determines that one or more of the following factors exist as to each parent, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent: * * * (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by actions showing an unwillingness to provide an adequate permanent home for the child; * * * (11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 [2151.35.3] or2151.415 [2151.41.5] of the Revised Code with respect to a sibling child; * * * (16) Any other factor the court considers relevant."
 {¶ 24} In support of its permanent custody award, the trial court found that at the time of the December 10, 2001 motion for termination of parental rights, Saliah had been in the temporary custody of SCFS for more than twenty-one consecutive months.[17] By the time the final hearings were concluded in June 2002, Saliah had been in temporary custody in excess of twenty-seven consecutive months.[18] In addition, Cook had her parental rights to Ariana Cook involuntarily terminated by the Hancock County Common Please Court on May 8, 1998, and both parents' rights to Zachary Cook were involuntarily terminated by the Franklin County Common Pleas Court on August 23, 2001.[19] The court found that the parties' failure to regularly support, visit, or communicate with the Saliah when able to do so and other conduct evidenced an unwillingness to provide an adequate home and lack of commitment toward the child,[20]
concluding that Saliah could not be placed with either parent within a reasonable period of time.[21] Proceeding to examine the child's best interests, the court found that, pursuant to R.C. 2151.414(D)(1), (2), (3), (4) and (5), clear and convincing evidence supported that a termination of parental rights and an award of permanent custody to SCFS was in Saliah's best interests.
 {¶ 25} Because the findings as to the duration Saliah had been in temporary custody and the fact that both parties previously had their rights to siblings of the child involuntarily terminated are uncontested, we have limited our review to whether a termination of parental rights and award of permanent custody were in the child's best interests. For the following reasons, we are not convinced that the trial court's findings are unsupported or that the court abused its discretion in granting SCFS's motion for permanent custody.
 {¶ 26} The record reflects that Botello has an extensive history of belligerent, aggressive and abusive behavior toward Cook, family services caseworkers, and others. He was convicted of domestic violence in 1999 and aggravated rioting in 2000. He had two civil protection orders obtained against him by family members of his children: one by Cook in 2000, upon allegations of verbal and physical abuse and one by a maternal grandfather of another child in 1995 or 1996, to protect his minor daughter. Botello's mother identified two incidents of violence predating the protection order. The transcript of the proceedings reveals that he was evasive, non-responsive, and confrontational with the court and counsel. The court expressly found that Botello was not forthright and that his testimony lacked credibility.
 {¶ 27} In March 2001, Cook provided a history of Botello's abuse to the Open Arms Domestic Shelter, listing: "objects thrown, threatened with physical/sexual abuse, pushed, shoved, grabbed, slapped, name calling, belittlement." She indicated that he was very possessive and overly protective of her, that he constantly yelled at her because of their children, that he frequently accused her of infidelity, that he isolated her from all others except his mother, that he would become violent when she attempted to leave him, that his behavior would not improve when she returned, and that they could not trust one another. In addition, Botello made threats of physical violence towards an FCCS caseworker in relation to Zachary Cook's case plan and exhibited threatening behavior toward an SCFS caseworker, who felt it necessary to file a complaint with the Sheriff's Department.
 {¶ 28} Botello admitted to violating the protection order in contravention of the case plan in a chance sexual encounter, resulting in her subsequent pregnancy with Feliciah, but claimed it was a single incident of contact during the summer of 2001. However, the SCFS caseworker that he had previously threatened testified that she had seen Botello and Cook together at Wal-Mart in March 2002, and once Botello realized she had observed them together, he followed her to various parts of the store. Botello initially denied being in Wal-Mart, subsequently admitted to having been there in Cook's presence, but maintained that it was merely coincidental. A SCFS transportation provider testified that she was fearful of Botello and would not let him visit the children without supervision. She further reported that he had made repeated phone calls to Cook during a recent visitation, demanding that she remove her belongings from their then-current residence.
 {¶ 29} Cook's former stepfather, Paul Main, testified that the parties' relationship was a constant fight and that they continuously caused trouble for those around them. He reported having witnessed Botello selling marijuana within the preceding year and another occasion in the past four months where Botello had consumed a case of beer in about two hours. He also observed Botello push Cook and call her derogatory names when she was more than eight months pregnant. Main described Botello as excessively controlling and testified that he eventually rejected a majority of the assistance offered to the couple. Main had offered Cook a stable residence in Fostoria, Ohio, but she declined upon Botello's refusal.
 {¶ 30} As of April 8, 2002, Botello owed $4,002.44 in child support arrearages and there no evidence that he had provided any other form of support for Saliah. Botello was unemployed during a majority of the proceedings and worked sporadically for his brother's construction company while continuing to draw unemployment. Millwood Industries, a previous employer, terminated Botello for excessive absenteeism, aggressive behavior, poor attitude, and for filing an unsubstantiated complaint with OSHA that halted production for days. Although skilled in masonry, electrical, framing, and other construction labor for which individuals are paid between twenty and thirty dollars per hour, he admitted that he had not taken steps to be certified as to any of these skills and claimed that he was only paid six dollars per hour.
 {¶ 31} Although aware of the requirements of the initial case plan adopted in May 2000 and subsequent amendments thereto, Botello failed to fulfill minimal case plan requirements, much less make reasonable efforts to obtain visitation with his daughter. He failed to complete parenting, domestic violence or anger management counseling, and had not submitted or obtained a counselor recommendation that he was suitable for visitation. Although he submitted a motion for visitation, he failed to appear for a hearing in support thereof.
 {¶ 32} Between February 2001, and the final hearings in June 2002, Cook held not less than seven different jobs in five cities and two states. She was periodically unemployed, generally worked less than full time, was inconsistent with wage withholding for child support, owed $2,937.14 in arrearages as of April 8, 2002, and continued to work for employers who did not offer medical or other benefits. She was placed on probation for arguing with a coworker while employed by Upfront Construction and subsequently quit. She later obtained a job at Taco Bell, where she continued to work an average of thirty-two to thirty-five hours per week and medical benefits were only available to managers. Laura Krause, a child support caseworker for the Department of Human Services, testified that her office had recently been notified that Cook had been terminated from Taco Bell in Fostoria, effective March 12, 2002. Cook claimed that Taco Bell had lied and that she had been laid off as opposed to fired. She obtained employment at Taco Bell in Fremont as of May 8, 2002, but was subsequently fired for unexplained corporate policy reasons.
 {¶ 33} Throughout the proceedings, the couple remained dependent upon and resided with relatives or friends in locations that had not been approved by caseworkers or were found to be unfit for their children. Since February 2001, Cook had resided at eight different locations, including two locations in Brownsburg, Indiana and four cities in Ohio. Botello was essentially transient and often concealed his address and phone number to avoid further, unrelated legal proceedings. Since December 2001, he had lived at three separate residences. Additionally, the couple had moved from a residence within the preceding weeks due to a verbal and physical altercation with another resident's brother in front of other children, including a three-year-old. One witness testified that the children pleaded with Botello not to fight.
 {¶ 34} Cook had once been approved for income-based housing but lost her qualification when she failed to come up with an initial deposit. Although the couple had since been approved for assistance with a single bedroom apartment, they demanded a two-bedroom apartment for which they could not qualify. At the time of the final hearings, the couple was living with Botello's parents in Fremont, Ohio. Relative placement with Botello's parents had been explored by SCFS but was denied due domestic violence issues between the couple and their two-year failure to acquire a satisfactory fire safety inspection.
 {¶ 35} At the time of the final hearings, Patty Devaughn, Saliah's foster mother, had custody of Saliah since she was three-days-old and had provided a safe, nurturing, stable, and healthy home for more than two years. Devaughn cooperated diligently with the case plan, and there was no evidence that she had done anything to impair or delay the execution of the case plan or the parties' efforts towards compliance. During the preceding years, Saliah became accustomed to and bonded with Devaughn, who also has custody of her sister, Feliciah, and had expressed a desire to adopt both children. Saliah had ongoing interaction with Devaughn's extended family, identifying Devaughn as her "mother" and Devaughn's parents as her grandparents.
 {¶ 36} Devaughn testified that when visitation did occur, Saliah interacted appropriately with Cook but had trouble sleeping after visits and did not otherwise ask for Cook or Botello. Cook claimed that Devaughn was neglecting Saliah because she had been underdressed for the weather on one occasion and had arrived at a couple of visits without sufficient diapers. An investigation of these allegations revealed them to be unfounded. Cook subsequently admitted that the daycare provider may have forgotten to supply the diapers, that diapers were always available at the visits, and that she had never purchased or supplied diapers for visits despite her complaints. Although Cook had recently obtained a learner's permit for a driver's license, she had been dependent upon SCFS transportation services for visitation for more than two years because she had not paid a $151.00 traffic fine received four years earlier.
 {¶ 37} In January 2001, Cook offered to surrender her parental rights to Saliah to SCFS and executed documents that would facilitate adoption. Without notice to the court, she moved to Brownsburg, Indiana on March 17, 2001, and remained there without visiting Saliah until July 2001. After a July 12, 2001 visitation, Cook did not visit Saliah until December 2001. She failed to cancel or show for an August 9, 2001 visit, did not request or schedule another visit until the end of October 2001, cancelled a November 21, 2001 appointment, reschedule the appointment for November 30, 2001, and then again failed to attend the appointment. On December 3, 2001, she reported that her car broke down and rescheduled the appointment for December 5, 2001, but again failed to show for the appointment.
 {¶ 38} After the final motion for permanent custody was filed on December 10, 2001, the frequency and consistency of Cook's visits with Saliah improved. However, she remained dependent upon SCFS for transportation and had four cancellations in the following four months, two of which were unexplained. In addition, an SCFS transportation provider waited approximately fifteen minutes while Cook refused to come out of a residence for an April 2002 visitation, despite another resident's attempts to convince her to attend the visitation. She also contacted SCFS on April 6, 2002, to surrender her parental rights to Saliah, but failed to consummate the surrender. Finally, within two weeks of the final hearing, Cook contacted a caseworker and requested that she have the foster mother provide money for a visitation because she could not afford to purchase fast-food meals for herself and the children.
 {¶ 39} The record further evidences that Cook and Botello were unable to successfully complete counseling. Cook claimed to have attended counseling in Indiana but failed to produce material verifying her attendance. When she signed a release of information form and the listed counseling providers were contacted, both locations reported that they had no record of her. Barbara Banecheck, a Firelands Community Hospital employee, provided family counseling for Cook from November 2000, through February 2001. During that period, they met a total of nine times before Cook voluntarily and prematurely left the program. Banecheck testified that Cook was not effective in pursuing reunification goals and was not ready to be released from the program. She found that Cook gravitated toward and remained dependent upon Botello and his family, whom Banecheck identified as negative influences. She stated her opinion that Cook had not demonstrated any parenting skills during the nine sessions, needed significant assistance if she hoped to develop any such skills, and had not attained any level of competent independence.
 {¶ 40} Lila Allen, an outpatient counselor at Catholic Charities in Fostoria, outlined services provided to Cook by SCFS as part of the agency's reunification efforts. Allen testified that Cook attended nine appointments between December 2001, and March, 2002, but missed four appointments and was required to sign a "last chance" agreement prohibiting any further absences on April 12, 2002. On May 1, 2002, she did not call or appear for a scheduled appointment and was subsequently discharged. Allen testified that the discharge was not related solely to absences and indicated in the discharge letter that it was "evident that Rebecca is not investing in herself in the treatment process sufficient to offer a reasonable chance of benefit." During the sessions she did attend, Cook acknowledged that she was mentally and physically abused by Botello, did not consult with or went against counselor recommendations as to the release of the protection order against him, concealed her reunion with him, and denied or concealed her pregnancy. She further admitted that she lost a job when she became involved in an altercation with a co-worker. Subsequent investigation revealed that Rebecca was six months pregnant with Feliciah at the time of the altercation and had known she was pregnant since approximately the third month of pregnancy. Allen testified that Cook needed additional parenting classes, including several weeks of counseling at Catholic Charities.
 {¶ 41} Michael Cheatham, a licensed social worker and case manager for the First Step Family Violence Intervention Center, counseled both Cook and Botello. He saw Cook for an initial consultation in early 2000. After meeting with her a few times, they had no contact for a period of nine months. Between October 2001, and April 2002, they had only four appointments. Although Cook had since completed a Passages Program, a psycho-educational class on parenting skills, anger management, domestic violence, and conflict resolution, Cheatham testified that her conduct reflected that the program was ineffective and that additional counseling would be required before lifting the CPO.
 {¶ 42} Cheatham indicated that Botello had not completed the Passages Program and would need additional counseling in addition thereto. Although Botello had recently completed a program at First Step Family Services center, they found that additional counseling would be necessary. He had called but not participated in a drug and alcohol treatment facility. Although he had attended an anger management program in March 2001, they would not certify his completion because he refused to pay a seventy-five dollar fee and there was no evidence as to whether they found the program to be successful.
 {¶ 43} Guardian ad litem, Judith Reiter, testified that she was particularly concerned with the couples' transient lifestyle, lack of stable housing or employment, and inability to complete or apply the lessons from counseling. Having observed Cook with Saliah and Feliciah, Reiter opined that she appeared to attempt to entertain as opposed to parent or nurture the children. Reiter was exceedingly apprehensive about Botello due to his history of domestic violence and the manner in which he continued to conduct himself with Cook, counselors, social workers, and other court personnel. She further stated that the couple had been presented with liberal opportunities to comply with reunification plan guidelines and had repeatedly failed to follow through with minimal objectives, concluding that the only way to a stable and permanent home was termination of parental rights. Anne Lang, another guardian ad litem, concurred in the recommendation, testifying that neither parent had demonstrated that they could abide by or complete the case plan within a reasonable time.
 {¶ 44} Upon review of the record, we find that sufficient, competent, credible evidence was presented as to the need for permanent commitment of this child to the state. Botello failed fulfill minimal case plan requirements, much less make reasonable efforts to obtain visitation with his daughter. Cook admitted that she remains with Botello against the recommendations of several counselors, that her transience evidenced a lack of commitment to Saliah, that her lack of visitation constituted neglect, that she has not had stable, full-time employment, and that she still does not have and could not guarantee when she would obtain stable housing. Having provided repeated opportunities for reunification, the trial court carefully considered and correctly applied all relevant factors as to the child's best interests. Consequently, because the trial court's termination of parental rights and grant of permanent custody is supported by clear and convincing evidence, Cook and Botello's respective assignments of error are without merit.
 {¶ 45} Having found no error prejudicial to the appellants herein, in the particulars assigned and argued, the judgment of the Seneca County Common Pleas Court, Juvenile Division, is hereby affirmed.
Judgment affirmed.
BRYANT, P.J. and SHAW, J., concur.
[1] In re Ariana Cook (Oct. 8, 1998), Hancock App. No. 5-98-16.
[2] R.C. 2151.419(A)(2)(e).
[3] In re Brodbeck (1994), 97 Ohio App.3d 652, 659, quotingGerijo, Inc. v. Fairfield (1994), 70 Ohio St.3d 223, 226.
[4] Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80; see, also, C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279.
[5] C.E. Morris Co., 54 Ohio St.2d at syllabus.
[6] In re Evans (Oct. 30, 2001), Allen App. No. 1-01-75,2001-Ohio-2302.
[7] R.C. 2151.419(A)(2)(e) (emphasis added).
[8] In re Murray (1990), 52 Ohio St.3d 155, 157; Stanley v. Illinois
(1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-1213, 31 L.Ed.2d 551,558-559.
[9] In re Murray, supra, citing Santosky v. Kramer (1982), 455 U.S. 745,753, 102 S.Ct. 1388, 1394-1395, 71 L.Ed.2d 599, 606.
[10] In re Palmer (1984), 12 Ohio St.3d 194, 196, certiorari denied105 S.Ct. 918, 469 U.S. 1162, 83 L.Ed.2d 930.
[11] See Miller v. Miller (1988), 37 Ohio St.3d 71, 74.
[12] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
[13] In re Rodgers (2000), 138 Ohio App.3d 510, 519; R.C. 2151.414.
[14] State v. Schiebel (1990), 55 Ohio St.3d 71, 74.
[15] In re Nicholas H. (2000), 137 Ohio App.3d 442, 448.
[16] In re Wise (1994), 96 Ohio App.3d 619, 624; In re Awkal (1994),95 Ohio App.3d 309, 315.
[17] R.C. 2151.414(B)(1)(d).
[18] Id.
[19] R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(11).
[20] R.C. 2151.414(E)(4) and (16).
[21] R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(4), (11) and (16).